## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| KATHLEEN GOODMAN, | : | |
| Plaintiff, | : | |
| | | Case No. 3:11cv00427 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Chief Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

Plaintiff Kathleen Goodman brings this case challenging the Social Security Administration's denial of her application for Disability Insurance Benefits (DIB). (*PageID#* 15).  She claims to be disabled due to fibromyalgia; myofascial pain syndrome; bulging discs in her cervical and lumbar spine; lumbar degenerative disc disease; chronic insomnia and fatigue; neck and back spasms; and nerve pain in her legs.  (*PageID##* 168, 185).  Her insured status expired on December 30, 2010.  (*PageID#* 181).  Plaintiff's application for SSI was denied because she was ineligible due to her family's income. (*PageID#* 114).  Plaintiff's application for DIB was denied initially and upon reconsideration.  (*PageID##* 122-25, 129-32).  On May 18, 2010, a hearing was held

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

before Administrative Law Judge (ALJ) James I.K. Knapp.  At the administrative hearing, Plaintiff amended her disability onset date from July 12, 2007, to September 28, 2007.  (*PageID#* 88).

After various administrative proceedings, ALJ Knapp denied Plaintiff's application based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (*PageID##* 60-73).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  This Court has jurisdiction to review the administrative denial of her applications.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), the administrative record (Doc. #6), and the record as a whole.

## II.  <u>BACKGROUND</u>

### A.  <u>Plaintiff's Vocational Profile and Testimony</u>

Plaintiff was 33 years old on her alleged disability onset date, which defined her as a "younger individual" for purposes of resolving her DIB claim.  *See* 20 C.F.R. §§ 404.1563(c); 416.963(c).

Plaintiff testified at the administrative hearing[2] that she is 5'7" and weighs 150 pounds. (*PageID#* 88).  She testified she lost 50 pounds about two years ago because of a

---

[2] Because the alleged errors raised by Plaintiff do not implicate the vocational expert testimony also presented at the administrative hearing, the Court has not summarized that testimony.

new medication she started taking.  (*PageID#* 89).  Plaintiff has three children (ages 6, 10, and 13); graduated from high school; and drives a car approximately two times a week.  (*Id.*).

Plaintiff testified, under oath, at the hearing held on May 18, 2010, that the last time she worked was in September 2007.  (*Id.*).  She testified the last job she had was providing daycare to three children in her house.  (*Id.*).  Plaintiff testified she stopped doing daycare out of her home because of pain, fatigue, and because she "was unable to keep up with the children that [she] was watching."  (*PageID#* 90).

Plaintiff testified that she experiences pain all over her body, however, the "very bad spots" are in her neck, lower back, and head.  (*Id.*).  Plaintiff testified she also feels pain radiating down both her arms and legs.  (*Id.*).  Plaintiff stated she takes Ultram and Robaxin for the pain, which help reduce it but do not relieve it entirely.  (*Id.*).  She estimates the medication provides a 50 percent reduction in pain.  (*Id.*).  Plaintiff also testified that she has undergone physical therapy, had therapeutic massages, visited a chiropractor, and received trigger-point and epidural injections, but such efforts have only provided temporary relief.  (*Id.*).

Plaintiff testified that she has degenerative disc disease and bulging discs, which cause her to experience pain in her legs and feet.  (*PageID#* 92).  Plaintiff stated the pain medications help with the low back pain, but not with the radiating pain.  (*Id.*).  She estimates the medication reduces her pain by about 40 to 50 percent.  (*PageID#* 93).

Plaintiff testified she is also now having problems with depression.  (*PageID#* 94).

3

She states she has no desire to get out of bed, and puts off things that need to be done around the house. (*Id.*). She testified she tried about seven or eight anti-depressants, however, she has not found one with side effects she can tolerate. (*PageID#* 95). Plaintiff testified she currently sees a counselor. (*Id.*).

During a typical day, Plaintiff testified she will watch TV, read a book, sometimes go on the Internet, and take a nap (either in late morning or early afternoon for about two to three hours). (*PageID#* 95). Plaintiff testified her son helps cook meals for everyone, her kids do the dishes, but she can sweep or vacuum on occasion. (*PageID#* 96). Plaintiff testified she can do the laundry with the assistance of her children, goes grocery shopping once a week, goes to church once a week, and has sung in the church choir on occasion. (*Id.*). Plaintiff testified she goes to visit other people, friends, relatives or neighbors about once a week, but tends to talk on the phone more. (*Id.*). She testified she rarely goes to the movies, but does take her children to their baseball games and watches them play. (*PageID#* 97). Plaintiff stated she can only walk, stand, or sit continuously for about 10 to 15 minutes before needing to stop and rest or shift positions. (*PageID#* 98). Plaintiff stated she can only lift five pounds. (*Id.*).

Plaintiff testified she now also has panic attacks that last from 15 minutes to one hour, and occur every three to four weeks. (*Id.*). Plaintiff stated they are brought on by stress and "just sitting and thinking about the things that are bothering me at the moment." (*Id.*). Plaintiff testified she has a flare-up from her fibromyalgia approximately three to four times a month, during which time she needs extra rest and to

4

be inactive. (*PageID#* 100). As to her pain, she stated "there is never a day where I know what's going to hit. . . Tends to be very frustrating and very hard to plan for certain activities." (*PageID#* 101).

### B.    <u>Medical Records and Opinions</u>

Plaintiff's treating physician, Anne Reitz, M.D., has been treating her for various issues since March 2004. Plaintiff visited Dr. Reitz on May 31, 2007, to review lab results. (*PageID#* 492). During this visit, Dr. Reitz provided a largely positive assessment. She noted that Plaintiff has been losing weight through diet and exercise, and aside from not being able to exercise as much because of pain in her foot, Dr. Reitz noted Plaintiff denied any other complaints. She also noted Plaintiff's heart was regular, lungs were clear, extremities show no edema, cholesterol in excellent range, and sugar levels normal. (*Id.*). No significant concerns, including regarding back or neck pain, were raised or otherwise noted at this May 2007 visit.

A few months later, on July 12, 2007, Plaintiff again was examined by Dr. Reitz. At this visit, Plaintiff complained of low back pain, which she stated had been going on for "about 5 days." (*Id.*). Dr. Reitz examined Plaintiff and noted "no point tenderness over the spine itself. Muscle spasm noted over the left lower lumbosacral region. SLR positive bilaterally. Reflexes were 1+ and symmetric throughout. Normal sensation." (PageID# 492). Dr. Reitz ordered x-rays and referred Plaintiff to physical therapy. She also recommended applying moist heat and doing gentle stretching; gave Plaintiff a shot of Celestone; and prescribed prednisone for the next two weeks.

5

Plaintiff was seen by Lisa Reith, P.T., on July 18, 2007, for her initial physical therapy session and for subsequent treatment on July 20, 2007. Plaintiff informed Ms. Reith that she started having back pain three weeks ago. (*PageID#* 291).

On July 30, 2007, Plaintiff had a follow-up visit with Dr. Reitz regarding the MRI and x-rays she had performed. Dr. Reitz noted Plaintiff continued to complain of low back pain. (*PageID#* 490). According to Dr. Reitz, however, Plaintiff appeared only in mild distress; no weakness elicited; reflexes were 2+ and symmetric throughout; muscle strength 5/5 bilateral upper and lower extremities. (*Id.*). Dr. Reitz reviewed the MRI of the neck and cervical spine x-rays and noted the results were negative. She noted the results of the lumbar spine x-rays were also "unremarkable," and next ordered an MRI of the lumbar spine. (*PageID#* 490).

Plaintiff had the MRI completed on August 3, 2007. (*PageID#* 269-271). Dr. Reitz's treatment notes indicate the MRI showed only a mild disc bulge in her back, and a C3-4 disc impingement in her neck. (*PageID#* 489). Dr. Reitz recommended Plaintiff visit a neurosurgeon.

On August 9, 2007, physical therapist Lisa Reith sent a letter to Dr. Reitz indicating that Plaintiff has made no attempt to schedule more testing after her last visit on July 20, 2007. (*PageID#* 294).

Plaintiff was evaluated on September 5, 2007, by neurosurgeon, Hugh Moncrief, M.D. Dr. Moncrief indicated Plaintiff had a cervical sprain/strain, lumbar sprain/strain, and degenerative disc disease. (*PageID#* 278). He did not feel surgery on either the

cervical or lumbar spine would improve her symptomatology, and instead recommended physical therapy and possible therapeutic injections. (*Id.*). Dr. Moncrief later recommended she meet with Dr. Townsend Smith for therapeutic injections into the lumbar and cervical area, to which she agreed. (PageID# 276).

Treatment notes indicate two days later, on September 12, 2007, Plaintiff called Dr. Reitz and requested a script for a transcutaneous electrical nerve stimulation (TENS) unit, and Dr. Reitz complied. On September 19, 2007, Plaintiff visited pain specialist, Dr. Smith. (*PageID#* 360). According to Dr. Smith, Plaintiff told him that she has had neck and arm pain intermittently for the past two years and back pain "for over 12 years." (*Id.*).

Dr. Smith noted that "Dr. Moncrief did not feel that [the] disk bulges were clinically significant, and thus did not require surgical intervention." (*Id.*). Dr. Smith noted that the MRI of the lumbar back only reveals a small disk protrusion at L2-3 and L5-6, and degenerative disk disease. (*Id.*). He also noted that Plaintiff's sleep cycle is not affected, pain is improved with lying down on her side with a pillow between her legs, ice helps the low back pain, and the TENS unit helps to improve her symptoms. Nonetheless, Dr. Smith treated her with trigger point injections and epidural injections. (*PageID#* 362).

After the injections, in October 2007, Dr. Smith noted that Plaintiff complained her pain was not improving. (*PageID#* 369). Dr. Smith ordered a new MRI, for which the results show a disk bulge at L3-4, but no impingement upon the nerve root. Dr. Smith

7

also noted "no major structural abnormalities . . . "  The previous MRI only revealed small disk protrusion at the L4-5 and L5-S1 levels, also with no nerve root impingement. (*Id.*).  Dr. Smith therefore explained to Plaintiff "that her symptoms are most likely related to just simple nerve root irritation which sometimes occurs in relation to any type of injection therapy . . ." (*Id.*).  Dr. Smith recommended she continue with physical therapy, particularly because he was hopeful the results would be different after having undergone injection therapy.  (*Id.*).

Dr. Reitz completed a questionnaire on January 10, 2008.  (*PageID#* 327).  She indicated Plaintiff does not have a history of any mental impairment; the mental impairment in her report is associated with her physical findings; she is prescribed Lexapro and Cymbalta; she has not been referred to a mental health specialist; and there are no functional restrictions related to the mental impairment.  (*Id.*).  Dr. Reitz diagnosed fibromyalgia; indicated a worsening of conditions over the past two years; noted that Plaintiff has obtained physical therapy as needed; and takes oral pain medications and antidepressants (used for fibromyalgia).  (*PageID#* 328).

Plaintiff returned to Dr. Reitz on January 30, 2008.  (*PageID#* 485).  Dr. Reitz noted that Plaintiff complained of sinus issues, and diagnosed sinusitis.  She noted that Plaintiff "appears well, vital signs are as noted by the nurse."  (*Id.*).  Dr. Reitz did not make any notation regarding complaints of pain.

On February 21, 2008, Alan R. Boerger, Ph.D., evaluated Plaintiff at the request of the Ohio Bureau of Disability Determination.  Dr. Boerger noted that Plaintiff drove

herself to the appointment; appeared clean and well groomed; arrived on time; and her speech and thought processes were appropriate, relevant and coherent.  (*PageID##* 375-76).  Plaintiff reported that she does not drink alcohol and denies ever having a problem with abusing alcohol or other drugs.  (*PageID#* 375).  Dr. Boerger noted that Plaintiff took care of three children in her home, but said she stopped because she "couldn't handle any more - the constant getting up and down." (*Id.*).  She said she always got along "fine" with others on a job.  (*Id.*).  Plaintiff's affect was appropriate to the situation; she denied having problems with depression; said her antidepressant medication is for insomnia; and denies feeling hopelessness.  (*Id.*).  Plaintiff appeared alert and oriented to time, place and person.  (*PageID#* 377).  She reported trouble with her memory; was able to perform single digit addition, subtraction, multiplication and division; was able to recall 8 digits forwards and 6 backwards; and seemed to be above average range level intellectual abilities.  (*Id.*)

Plaintiff stated she gets up at 6:15 A.M. on weekdays, takes her middle son to school and then returns home to eat breakfast.  Next, she sometimes does light housecleaning or the dishes.  (*Id.*).  She watches her 4 year old son during the day and they take a nap from 1:00 to 3:00 P.M.  (*Id.*).  She usually goes to bed by 10:00 P.M.; enjoys reading; likes to do things on the computer on a "time limited basis"; and can only sit for about 30 to 40 minutes at a time.  (*Id.*).  She reports she has joined the choir at church and goes to practice once a week, but sometimes misses the services because of her health condition.  (*Id.*).  Dr. Boerger found that Plaintiff "does not display sufficient

symptoms of any type of emotional disorder to warrant a formal diagnosis.  Situational stress may have an impact on the severity of her physical symptoms at time." (*PageID#* 378).  Dr. Boerger found Plaintiff's ability to relate to others, including fellow workers and supervisors is only mildly impaired as a result of reduced frustration tolerance; her ability to understand and follow instructions is only mildly impaired and reflected in some forgetfulness in day-to-day activities; her ability to maintain attention to perform simple repetitive tasks is unimpaired; and her ability to withstand the stress and pressures associated with day-to-day work activity is unimpaired.

A few days after this evaluation, on February 28, 2008, Plaintiff again visited Dr. Reitz to follow-up regarding her fibromyalgia.  Dr. Reitz noted that Plaintiff was "off cymbalta secondary to side effects" and "completely off lyrica as well." (*PageID#* 479). She noted Plaintiff reports myalgias, neck pain, back pain and joint pain, but the pain is stable.  (*Id.*).

On March 10, 2008, Marianne Collins, Ph.D., reviewed the record.  (*PageID#* 380).  She found that Plaintiff did not have a medically determinable mental impairment. (*Id.*).

On April 30, 2008, BDD reviewing physician Myung Cho, M.D., completed a physical residual functional capacity assessment and opined that Plaintiff could occasionally lift/carry up to 20 pounds; frequently lift/carry up to 10 pounds; stand/walk for a total of 6 hours in an 8-hour workday; sit for a total of 6 hours in an 8-hour workday; push and/or pull without restrictions; occasionally climb ladders, ropes, or

scaffolds; and can frequently stoop and crouch.  (*PageID##* 398-99). Dr. Cho determined Plaintiff's allegations to be partially credible.  (*PageID#* 402).

Plaintiff returned to visit Dr. Reitz on June 2, 2008, for another follow-up regarding fibromyalgia.  (*Id.*).  Plaintiff was still off cymbalta and lyrica.  (*PageID#* 474). She reported myalgias, neck pain, back pain, and joint pain.  Dr. Reitz noted Plaintiff's musculoskeletal system was normal, and she reported no depression.  (*Id.*).

In August 2008, Dr. Reitz completed a Medical Questionnaire stating that Plaintiff has fibromyalgia; myofascial pain syndrome; degenerative disc disease in the neck and low back; and her condition has been worsening since July 2007.  Dr. Reitz opined that Plaintiff could sit continuously for 20-30 minutes; stand continuously for 35-40 minutes; walk for ½ mile without stopping; bend occasionally; stoop rarely; lift only 5 pounds occasionally; and grasp for 10-15 minutes.  Dr. Reitz also indicated Plaintiff had poor concentration and memory due to her medicine and illness.  (*PageID#* 264).

On August 28, 2008, Carl Tishler, Ph.D., reviewed and affirmed Dr. Collins' assessment.  (*PageID#* 407).

In September 2008, Dr. Reitz sent a letter to Cornerstone Medical Services, indicating that Plaintiff "has had low back pain for several years and has tried multiple medications with no relief.  Patient has been using her TENS unit since receiving it and is having beneficial results with its usage."  (*PageID#* 469).

Dr. Cho's assessment was affirmed on October 14, 2008, by Maria Congbalay, M.D. (*PageID#* 408).

On November 14, 2008, Plaintiff again visited with Dr. Reitz for a follow-up visit regarding her fibromyalgia.  Dr. Reitz noted that Plaintiff's "pain has been reportedly fair. Worse at bedtime. Unable to tolerate the Lyrica due to sedation but this did seem to help her pain.  She is taking ibuprofen and Ultram daily and Robaxin if needed." (*PageID#* 464).

Plaintiff again visited Dr. Reitz on March 5, 2009, for a follow-up visit.  She informed Dr. Reitz she had to stop her medications for about a month due to insurance, although she stated she still has not restarted all of them.  (*PageID#* 458).  She noted achiness in her arm.  (*Id.*).  Dr. Reitz saw Plaintiff again on April 10, 2009, and noted Plaintiff now stopped taking ibuprofen due to stomach "not tolerating it well," she has not had any recent labs, and "no other concerns."  (*PageID#* 452).  Dr. Reitz noted Plaintiff's "general joint exam is normal with full range of motion of spine, shoulders, elbows, wrists, fingers, hips, knees and ankles; no active swelling, tenderness or synovitis at any joint.  No soft tissue nodules."  (*PageID#* 453).

Plaintiff visited Dr. Reitz on May 22, 2009, for another follow-up visit.  Dr. Reitz noted that Plaintiff's pain is stable, she lost her father a month ago and is "doing ok." (*PageID#* 446).

Shortly thereafter, on June 3, 2009, Plaintiff started treating with chiropractor, Andrew T. Hummel, D.C.   Dr. Hummel treated Plaintiff's back pain with "conservative therapy of moist heat and full spinal manipulation, activator only on cervical and manual thoracic and lumbar," and instructed her to ice the area in the evening for 20 minutes.

12

(*PageID#* 531). After visiting Dr. Hummel on June 5, 8, and 12, Plaintiff returned on June 15. At this appointment, Dr. Hummel noted she had decreased spinal pain, as well as decreased tenderness and an increased range of motion of the cervical spine. (*PageID#* 531). On June 19, 2009, Plaintiff complained of increased low back pain "due to prolonged lying on her back during the medical procedure she had done on 6/16/2009." (*Id.*).

On June 22 and June 26, 2009, Dr. Hummel noted improvement of symptoms. (*Id.*).

On June 29, 2009, Dr. Hummel noted that Plaintiff complained of increased low back pain and mid back pain, but stated the pain was "due to lifting and moving boxes." Dr. Hummel again noted cervical spine range of motion improved. (*Id.*).

On July 3, 2009, Plaintiff again complained of an increase in neck pain, mid back pain, and low back pain. Dr. Hummel noted again, however, that Plaintiff "is still moving boxes and doing heavy lifting."

A week later, on July 10, 2009, Plaintiff visited Dr. Hummel. (*Id.*). Dr. Hummel noted Plaintiff's neck pain and mid back pain decreased but her low back pain increased, again, due to moving more boxes. (*Id.*). Nonetheless, Dr. Hummel noted an increased range of motion of the cervical spine, improved range of motion of the thoracic spine, and less tenderness. (*Id.*).

13

On July 15, 2009, Plaintiff returned to Dr. Hummel.  (*Id.*).  Dr. Hummel noted that "Patient states there is significant improvement of symptoms of primary complaint since last visit with 90% less intense ache and stiffness." (*Id.*).

Plaintiff then treated with Dr. Reitz on July 22, 2009.  Dr. Reitz indicated Plaintiff had some depression symptoms related to losing her father and being in a "loveless" marriage.  She prescribed paxil, and recommended continued counseling. (*PageID#* 440).

Two days later, Plaintiff returned to see Dr. Hummel on July 24, 2009.  Plaintiff told Dr. Hummel that symptoms have remained the same since last visit but some periods of more intense pain occur after activity.  (*PageID#* 529).

On July 31, 2009, Plaintiff again treated with Dr. Hummel.  Again, Dr. Hummel noted that Plaintiff's "symptoms have remained the same since last visit but with some periods of more intense pain usually after activity."

On August 7, 2009, Plaintiff visited Dr. Hummel and reported "significant improvement of symptoms of primary complaint since last visit with 75% less aches and stiffness." (*Id.*).

On August 21, 2009, Plaintiff treated with Dr. Hummel, who noted "symptoms have remained the same since last visit but with some periods of more intense pain usually after activity." (*Id.*).

Plaintiff underwent an adult diagnostic assessment at Miami County Mental Health on September 9, 2009.  (*PageID#* 641).  Plaintiff noted her husband lost his job in January 2009, has since quite 4 other jobs, and they are losing their house.  (*PageID#*

14

642). She reported that her life growing up was "sometimes chaotic, sometimes wonderful." (*Id.*). She reported her father was an alcoholic, but stopped drinking completely 11 years ago, and her mother had many health problems. (*PageID#* 643). She reports she did great in school (3.71 GPA). (*Id.*). She reports her marriage is "strained." (*Id.*). She was observed to be depressed and anxious, and had problems with attention and concentration. (*PageID#* 651). She was diagnosed with alcohol dependence in early partial remission, major depressive disorder, generalize anxiety disorder, and PTSD. (*PageID#* 654). She received motivational enhancement therapy and cognitive behavioral change. (*PageID##* 624-27, 629-31, 633, 635-37).

On September 14, 2009, Dr. Hummel noted "Patient states that symptoms have remained essentially the same since last visit with no improvement or worsening." (*Id.*).

On October 16, 2009, Plaintiff reported a decrease in spinal pain, and Dr. Hummel noted an increase in lumbar extension with decreased pain. (*Id.*).

On November 10, 2009, Plaintiff was examined by Jon P. Ryan, D.O. Dr. Ryan noted Plaintiff's complaints of diffuse joint pain, which he associated with diffuse muscle pain in the majority of muscle beds, and opined that her physical exam shows only mild tender points consistent with fibromyalgia. (*PageID#* 523). On November 24, 2009, Dr. Ryan again examined Plaintiff. He noted that x-rays reveal she may have a minimal amount of arthritis in her lower back, and diagnosed fibromyalgia. (*PageID#* 522).

On November 25, 2009, Dr. Hummel noted Plaintiff's "symptoms have remained the same since last visit but with some periods of more intense pain usually after activity."

Plaintiff began physical therapy on December 3, 2009.  (*PageID#* 609).

On December 16, 2009, Dr. Hummel noted that Plaintiff's "symptoms have remained the same since last visit but with some periods of more intense pain usually after activity."

On December 28, 2009, Plaintiff reported "right neck pain and thoracic and lumbar stiffness and soreness from holding a choir book and prolong standing." (*Id.*).

On January 11, 2010, Dr. Hummel noted that Plaintiff's "symptoms have remained the same since last visit but with some periods of more intense pain usually after activity."

On January 27, 2010, Plaintiff completed her physical therapy.  Plaintiff reported improvement in her pain level (4-5/10), decreased number of trigger points and an increased knowledge regarding how to control symptoms.  (*PageID#* 541).  Notes also indicate that while Plaintiff reports high pain levels, she also recently decreased taking pain medications, and she "now demonstrates increased ability to control symptoms." (*Id.*).

On February 8, 2010, Dr. Hummel noted that Plaintiff "complains of a worsening of symptoms since last visit but feels this is due to a period of increased shoveling snow."

On March 8, 2010, Dr. Hummel noted Plaintiff "has neck pain, mid-back pain, and low back pain from lifting groceries and her younger son." (*Id.*).

Plaintiff's therapist, Connie Bittorf, completed a questionnaire on March 22, 2010. She noted Plaintiff suffers from depression/anxiety and is being treated with medications. She also noted counseling has helped manage her depression.   Plaintiff's prognosis was fair/good with continued counseling and medication management. (*PageID#* 667).  Ms. Bittorf opined that Plaintiff's mental impairments cause her slight restrictions of activities of daily living; moderate difficulties maintaining social functioning; moderate deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work setting or elsewhere); and moderate episodes of deterioration or decompensation in work. (*PageID#* 668).

Dr. Reitz completed interrogatories on April 1, 2010. She treated Plaintiff since March 11, 2004, for fibromyalgia; headaches; chronic insomnia; and chronic neck and lower back pain. (*PageID#* 670).  She did not believe Plaintiff was able to be prompt and regular in attendance; withstand the pressure of meeting normal standards of work productivity and work accuracy; demonstrate reliability; and complete a normal workday or workweek without interruption from psychologically based symptoms. (*PageID#* 670-72).  Dr. Reitz noted that Plaintiff could lift/carry five pounds occasionally and one to two pounds frequently; could stand/walk for one to two hours out of eight and uninterrupted for a quarter of an hour; could sit for one to two hours out of eight and uninterrupted for half an hour; could occasionally climb and balance; could never stoop, crouch, kneel or

17

crawl; and was limited in her ability to handle, finger, reach, and push/pull.  (*PageID#* 672-73).  Dr. Reitz noted that Plaintiff was easily fatigued and had pain; was limited in her ability to be around heights, move machinery, chemicals, temperature extremes, dust, noise, fumes, and vibrations.  (*PageID#* 675).  Dr. Reitz did not believe Plaintiff could perform sedentary work activity, and stated that Plaintiff needed to be able to lie down in order to manage her pain.  (*PageID#* 675-76).

## III.  ADMINISTRATIVE REVIEW

### A.  "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.  ALJ Knapp's Decision

18

ALJ Knapp resolved Plaintiff's disability claim by using the five-Step sequential evaluation procedure required by Social Security Regulations.  *See PageID##* 60-73; *see also* 20 C.F.R. § 404.1520(a)(4).  His pertinent findings began at Step 2 of the sequential evaluation where he concluded that Plaintiff had the following severe impairments: lumbar degenerative disc disease; cervical degenerative disc disease; and fibromyalgia.  (*PageID#* 63).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments.  (*PageID#* 67).

At Step 4, the ALJ concluded that Plaintiff lacks the residual functional capacity to: lift more than ten pounds frequently or twenty pounds occasionally; climb stairs, stoop, or crawl more than occasionally; or climb ladders or scaffolds.  The ALJ determined Plaintiff is therefore limited to performing a reduce range of light work. (*PageID#* 67).

The ALJ concluded at Step 4 that Plaintiff is capable of performing her past relevant work as a traffic clerk and customer service representative because this work does not require the performance of work-related activities precluded by Plaintiff's RFC. (*PageID#* 73).

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB. (*Id.*).

IV.   **JUDICIAL REVIEW**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

546-47 (6th Cir. 2004)).

## V.     DISCUSSION

### A.     Plaintiff's Contentions

Plaintiff argues the ALJ erred in rejecting the opinion of her treating physician, Dr.

Reitz, and instead relying on the opinions of Drs. Cho and Congbalay.  (Doc. #8,

*PageID#* 689).  Plaintiff also argues the ALJ erred in finding that she did not have a

severe mental impairment and in finding she was not credible.  (*PageID#* 694, 696).

Defendant contends Plaintiff's arguments lack merit and the ALJ's decision should be

affirmed.  (Doc. #11, *PageID#* 717).

### B.     Medical Source Opinions

#### 1.

#### Treating Medical Sources

The treating physician rule, when applicable, requires the ALJ to place controlling

weight on a treating physician's or treating psychologist's opinion rather than favoring

the opinion of a nonexamining medical advisor or a one-time examining physician or

psychologist or a medical advisor who testified before the ALJ.  *Blakley,* 581 F.3d at 406

(6th Cir. 2009); *see Wilson*, 378 F.3d at 544 (6th Cir. 2004).  A treating physician's

opinion is given controlling weight only if it is both well supported by medically

acceptable data and if it is not inconsistent with other substantial evidence of record.

(*Id.*).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. § 404.1527(d)(1).  Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight.  This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization.  *See* 20 C.F.R. § 404.927(d), (f); *see also* Ruling 96-6p at *2-*3.

## 2.

## <u>Non-Treating Medical Sources</u>

The Commissioner views non-treating medical sources "as highly qualified

physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id.* at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d), including, at a minimum, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. § 404.1527(f); *see also* Ruling 96-6p at *2-*3.

C.    **Analysis**

**1.**

The ALJ gave significant weight to the opinions of Dr. Cho and Dr. Congbalay, "as their assessments are supported by and adequately address the objective findings in the claimant's treatment notes and upon lumbar and cervical spine imaging and in the record . . ." (*PageID#* 68). The ALJ nonetheless also included more restrictive postural limitations, "in consideration of the claimant's partially credible complaints of pain." (*Id.*).

Specifically, the ALJ noted that Dr. Reitz's August 2008 and April 2010 assessments did not contain significant examination findings to support the restrictions she set forth therein. (*PageID#* 69). In the Medical Questionnaire completed by Dr.

23

Reitz in August 2008, she indicated that Plaintiff could sit continuously for no more than thirty minutes at a time, stand continuously for no more than forty-five minutes at a time, walk no more than a half mile without stopping, grasp no more than fifteen minutes at a time, rarely stoop, and bend no more than occasionally.  A little less than two years later, in April 2010, Dr. Reitz indicated in interrogatories that Plaintiff could lift and/or carry no more than five pounds occasionally or two pounds frequently, that she could stand and/or walk no more than fifteen minutes at a time or for a total of no more than two hours in an eight-hour workday, and that she could sit no more than thirty minutes at a time or for a total of no more than two hours in an eight-hour workday.  Dr. Reitz also indicated that Plaintiff could never stoop, crouch, kneel, or crawl; could only occasionally climb or balance; and her ability to reach, handle, finger, push, and pull were affected.  Dr. Reitz also opined that Plaintiff should avoid exposure to heights, moving machinery, chemicals, temperature extremes, dust, noise, fumes, and vibration; and could not perform light or sedentary work on a sustained basis.  (*PageID#* 68).

The ALJ found Dr. Reitz's opinion to be inconsistent with objective findings and "that Dr. Reitz apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant and seemed to uncritically accept as true most, if not all, of what she reported." (*PageID#* 69).  The ALJ further noted that "good reasons exist for questioning the reliability of the claimant's subjective complaints.  The totality of the medical evidence clearly supports that the claimant is not as severely limited as assessed by this doctor."  (*Id.*).  As discussed below, the ALJ's findings are supported by

24

substantial evidence.

Dr. Reitz treated Plaintiff since 2004, however, the restrictions set forth in her assessments from August 2008 and April 2010, as the ALJ noted, are not supported by her treatment notes.  Dr. Reitz treated Plaintiff for the allegedly disabling back pain in July 2007, when Plaintiff visited her and stated she had been having the pain for "about 5 days." (*PageID#* 492).  Dr. Reitz immediately ordered x-rays, MRIs, and physical therapy, in addition to treatment with medication.  Plaintiff complied, and shortly thereafter visited Dr. Reitz again.  Dr. Reitz, in addition to noting Plaintiff appeared in only "mild" distress, noted the MRI of the neck and cervical spine x-rays were negative.  She also noted the results of the lumbar spine were "unremarkable."  She thereafter ordered another MRI, this one of the lumbar spine.  Plaintiff complied, and returned in early August 2007.  Dr. Reitz indicated this MRI showed only a mild disc bulge, and C3-4 impingement in her neck.  (*PageID#*269-71).  Dr. Reitz recommended Plaintiff visit a neurosurgeon.  The neurosurgeon, Dr. Moncrief, examined Plaintiff and noted she had a cervical spine/strain, lumbar sprain/strain, and degenerative disc disease.  (*PageID#* 278).  Dr. Moncrief did not believe surgery would help, so he recommended she visit with Dr. Smith, a pain specialist, for therapeutic injections into the lumbar and cervical area.  (*PageID#* 276).

Dr. Smith noted that Dr. Moncrief did not believe the disk bulges were "clinically significant," and also noted that the MRI of the lumbar back only reveals a small disk protrusion at L2-3 and L5-6, and degenerative disc disease.  (*Id.*).  Dr. Smith noted that

Plaintiff's sleep cycle was not affected, pain was improved with lying down, ice helps, and the TENS unit helps.  (*Id.*).  After the injections, in October 2007, Dr. Smith ordered a new MRI, which showed a disk bulge at L3-4, but no impingement upon the nerve root. Dr. Smith told Plaintiff that her symptoms were likely related to irritation of the nerve root, and recommended physical therapy.

In January, 2008, Plaintiff saw Dr. Reitz for a sinus infection.  No notes were made regarding any complaints of pain.  (*PageID#* 485).  At the end of February 2008, Plaintiff again saw Dr. Reitz.  (*PageID#* 479).  At this visit, Plaintiff informed Dr. Reitz she was off of Cymbalta and Lyrica.  (*Id.*).  Plaintiff complained of pain, but Dr. Reitz noted it was stable.  (*Id.*).  Plaintiff visited Dr. Reitz in June 2008, at which time she was still off Cymbalta and Lyrica, and reported pain.

A few months later, in August 2008, Dr. Reitz completed the Medical Questionnaire.  Despite the fact Dr. Reitz noted on multiple examinations up to that point in time that Plaintiff's pain is "stable," she noted in the assessment that Plaintiff's condition has been worsening since July 2007.  (*PageID#* 264).  Dr. Reitz did not mention any improvement in Plaintiff's pain in the August 2008 assessment, yet in a letter sent the very next month to Cornerstone Medical Services she indicated that Plaintiff "has had low back pain for several years and has tried multiple medications with no relief. Patient has been using her TENS unit since receiving it and is having beneficial results with its usage."  (*PageID#* 469).  A few months later, Dr. Reitz noted in November 2008 that Plaintiff's "pain has been reportedly fair."  (*PageID#* 464).

26

Dr. Reitz also stated in her assessment that Plaintiff can only sit continuously for 20-30 minutes; stand continuously for 35-40 minutes; walk for ½ mile without stopping; bend occasionally; stoop rarely; lift only 5 pounds occasionally; grasp for 10-15 minutes; and has poor concentration and memory due to her medicine and illness.  (*PageID#* 264).  Yet how Dr. Reitz arrived at such conclusions is unclear as her treatment notes lack, as the ALJ noted, "any significant examination findings to support such restrictions." (*PageID#* 69).  In fact, Plaintiff was evaluated by Dr. Boerger shortly before Dr. Reitz completed her assessment, and during this evaluation Plaintiff herself indicated that she wakes up at 6:15 A.M. during the week, drives her middle son to school, eats breakfast, does some light housecleaning or dishes, enjoys reading, can use the computer, and is able to sit for 30-40 minutes at a time.  (*PageID#* 377).  Plaintiff also reported to Dr. Boerger that she joined the church choir and goes to practice once a week, although sometimes she may miss a service because of her health.  (*Id.*).

Over the next few years Plaintiff continued to visit Dr. Reitz regularly.  In March 2009, Plaintiff visited Dr. Reitz and informed her that she was off her medication for about a month due to insurance, but still had not restarted all of it.  (*PageID#* 458).  As noted by the ALJ, in April 2009 Dr. Reitz examined Plaintiff and noted "general joint exam is normal with full range of motion of spine, shoulders, elbows, wrists, fingers, hips, knees and ankles; no active swelling, tenderness or synovitis at any joint." (*PageID##* 69, 453).  On May 22, 2009, Dr. Reitz reported Plaintiff's pain is stable.  On June 3, 2009, Plaintiff also began to see chiropractor Dr. Hummel.

27

Dr. Hummel noted after a few treatments, on June 15, 2009, that Plaintiff had decreased spinal pain, decreased tenderness, and an increased range of the cervical spine. (*PageID*# 531).  Plaintiff did note an increase of pain on June 22, 2009, however, she also stated the pain was "due to lifting and moving boxes." (*Id.*).  Even with the increased complaints of pain, however, Dr. Hummel noted again that Plaintiff's cervical spine range of motion improved. (*Id.*).  On June 26, 2009, Dr. Hummel again noted an improvement of Plaintiff's symptoms. (*Id.*).  On July 3, 2009, Plaintiff complained of an increase in pain, but again, Dr. Hummel noted that Plaintiff stated she "is still moving boxes and doing heavy lifting." (*Id.*).  On July 10, 2009, Plaintiff had an increase in lower back pain, and again attributed this to moving more boxes. (*Id.*).  Even despite Plaintiff's heavy lifting and box moving, Dr. Hummel found Plaintiff had an increased range of motion of the cervical spine, improved range of motion of the thoracic spine, and less tenderness. (*Id.*).

On July 15, 2009, Plaintiff returned to Dr. Hummel.  At this appointment, he noted "Patient states there is significant improvement of symptoms of primary complaint since last visit with 90% less intense ache and stiffness." (*Id.*).  Yet while Dr. Hummel noted such significant improvement, a week later, on July 22, 2009, Dr. Reitz evaluated Plaintiff and noted "Pain worsened by depression," although did acknowledge "Chiropractor helping some too." (*Id.*).  Plaintiff visited her chiropractor, Dr. Hummel, on July 24, 2009, and reported the same level of symptoms, with some periods of more intense pain after activity. (*PageID*# 529).  Dr. Hummel noted on August 7, 2009, that

28

Plaintiff "reported significant improvement of symptoms of primary complaint since last visit with 75% less aches and stiffness." (*Id.*).

Plaintiff continued to treat with Dr. Hummel through March 2010. During this time, Plaintiff's symptoms most often stayed the same except for a report of more pain after activity. For example, on December 28, 2009, Dr. Hummel noted that Plaintiff had "right neck pain and thoracic and lumbar stiffness and soreness from holding a choir book and prolong standing." (*Id.*). On February 8, 2010, Plaintiff reported to Dr. Hummel that she experienced an increase in pain, this time due to "increased shoveling snow." (*PageID#* 541).

Plaintiff's notes from physical therapy, completed January 27, 2010, also note Plaintiff's pain level improved, she had a decrease in number of trigger points and an increase in knowledge regarding how to control symptoms. (*Id.*). Plaintiff reported high pain levels, yet simultaneously reported decreasing the amount of pain medications she was taking. Overall, it was noted she "now demonstrates increased ability to control symptoms." (*Id.*).

Dr. Reitz completed interrogatories a few months later, on April 1, 2010. (*PageID#* 670). She did not believe Plaintiff was able to: be prompt and regular in attendance; withstand the pressure of meeting normal standards of work productivity and work accuracy; demonstrate reliability; and complete a normal workday or workweek without interruption from psychologically based symptoms. (*PageID#* 670-72). Dr. Reitz noted that Plaintiff could lift/carry five pounds occasionally and one to two pounds

frequently; could stand/walk for one to two hours out of eight and uninterrupted for a quarter of an hour; could sit for one to two hours out of eight and uninterrupted for half an hour; could occasionally climb and balance; could never stoop, crouch, kneel or crawl; and was limited in her ability to handle, finger, reach, and push/pull.  (*PageID#* 672-73).  Dr. Reitz noted that Plaintiff was easily fatigued and had pain; was limited in her ability to be around heights, move machinery, chemicals, temperature extremes, dust, noise, fumes, and vibrations.  (*PageID#* 675).  Dr. Reitz did not believe Plaintiff could perform sedentary work activity.  She also opined that Plaintiff needed to be able to lie down in order to manage her pain.  (*PageID#* 675-76).

The ALJ, however, did not find Dr. Reitz's April 2010 assessment to be supported by the medical evidence.  (*PageID#* 69).  The ALJ noted that Dr. Reitz's treatment notes prior to this assessment showed relatively normal findings, and on a number of occasions Dr. Reitz noted Plaintiff's problems were "stable." The ALJ's decision is supported by substantial evidence.

The restrictions Dr. Reitz set forth in her August 2008 and April 2010 assessments lack support in the medical evidence.  Dr. Reitz's restrictions are not only unsupported by her own findings, but also largely inconsistent with the activities Plaintiff reported being able to do during this same period.  For example, while Dr. Reitz opined Plaintiff should be limited to only lifting five pounds occasionally and one to two pounds frequently, as well as limited to sedentary work activity, Plaintiff reported to her chiropractor on multiple occasions in June and July 2009 that she was moving boxes and doing heavy

30

lifting. Furthermore, in February 2010, just a few months prior to when Dr. Reitz completed her interrogatories, Plaintiff reported to her chiropractor that she was shoveling snow. (*PageID#* 541). Moreover, Dr. Reitz's August 2008 and April 2010 assessments can be fairly read as indicating Plaintiff's conditions have worsened, and are continuing to worsen, with the passing of time. Yet the very treatment notes from Dr. Reitz, as well as Plaintiff's chiropractor and physical therapist, indicate Plaintiff's conditions – particularly her pain levels – actually improved during this same period of time. In fact, in a number of instances, the improvement in Plaintiff's pain and other symptoms was rather significant, *despite* evidence indicating Plaintiff was taking less pain medication, and performing activities such as moving boxes, doing heavy lifting, and shoveling snow. (*PageID#* 541). In fact, at one visit to her chiropractor, Plaintiff reported to Dr. Hummel that she had "significant improvement of symptoms of primary complaint since last visit with 90% less intense ache and stiffness." (*PageID#* 531).

The ALJ provided "good reasons" for providing Dr. Reitz's assessments "little weight," and his findings are supported by substantial evidence. Ultimately, the ALJ decided to give great weight to the assessment of Drs. Cho and Congbalay, whose opinions, as the ALJ noted, "are supported by and adequately address the objective findings in the claimant's treatment notes and upon lumbar and cervical spine imaging in the record . . . ." (*PageID#* 67). Plaintiff argues the ALJ erred in doing so, however, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the

Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. § 404.1572(d), (f). The ALJ, therefore, did not err in relying on the assessment of Drs. Cho and Congbalay.

In addition, Plaintiff's argument that the ALJ "presum[ed]" that Dr. Cho and Congbalay's opinions "would not have changed had they had access to the entire record," (*PageID#* 690) lacks merit. Dr. Cho reviewed the medical records in April 2008, including all lumbar and cervical spine imaging in the record, and concluded Plaintiff was capable of performing a reduced range of light work. (*PageID#* 396-404). Dr. Congbalay later reviewed Plaintiff's updated medical records in October 2008, and affirmed Dr. Cho's opinion. (*PageID#* 408). The ALJ reasonably concluded these opinions were well-supported and consistent with the medical evidence and entitled to significant weight. Defendant is therefore correct in noting that Plaintiff's argument "is nothing more than a disagreement over how the ALJ weighed the evidence in the record" and moreover, that "the ALJ's decision should not be disturbed." (*PageID#* 709).

The ALJ reasonably rejected Dr. Reitz's opinions and provided good reasons for doing so. *See Price v. Comm'r of Soc. Sec.*, 342 App'x. 172, 175-76 (6th Cir. 2009) ("Where the opinion of a treating physician is not supported by objective evidence or is

inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion."). Accordingly, Plaintiff's argument lacks merit.

## 2.

Plaintiff also argues the ALJ erred in finding she did not have a severe mental impairment and that she erroneously rejected Dr. Reitz's assessments pertaining to her mental health. (*PageID##* 694-96). Defendant contends the ALJ's Step 2 finding is supported by substantial evidence and should not be disturbed. (*PageID#* 713).

The ALJ concluded that because Plaintiff's "medically determinable mental impairments cause no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation have been of extended duration in the fourth area, they are nonsevere. (20 CFR 404.1520a(d)(1))." (*PageID#* 67). The ALJ rejected the opinions of Dr. Reitz, Plaintiff's primary care physician, and Connie Bottorf, a counselor who treated Plaintiff for a period in 2009 and 2010, as inconsistent with, and unsupported by, the medical evidence. (*PageID#* 65-66). As discussed below, the ALJ did not err in rejecting these opinions and his Step 2 finding is supported by substantial evidence.

The ALJ first discussed Dr. Reitz's assessment regarding Plaintiff's mental health. The ALJ noted that Dr. Reitz stated in her January 2008 assessment that Plaintiff was prescribed Lexapro and Cymbalta (for fibromyalgia), but that she does not have a history of any mental impairment, and she has not referred patient to a mental health specialist. (*PageID#* 327-28). Dr. Reitz also noted in this assessment that Plaintiff does not have

33

any functional restrictions related to mental impairments.  (*Id.*).  A month later, in February 2008, consultative psychologist Alan Boerger, Ph.D., evaluated the claimant and, as noted by the ALJ, "he stated that the claimant did not show sufficient symptoms of any type of emotional disorder to warrant a formal diagnosis . . . " (*PageID#* 65).

Plaintiff essentially argues, however, that while she may not have had a severe mental impairment at the time of the alleged onset disability date (September 28, 2007) she developed one sometime thereafter.  (*PageID#* 713).  While Plaintiff's argument would be persuasive had the ALJ not reviewed all mental health records (i.e., during the time she alleged her condition worsened), that is not what occurred here.  In fact, the ALJ, quite extensively, considered the entirety of Plaintiff's mental health records and thereafter concluded that Plaintiff did not have a severe mental impairment at any time.

After the ALJ discussed Dr. Reitz's January 2008 assessment and Dr. Boerger's February 2008 assessment, he next considered Plaintiff's more recent mental health records, specifically her treatment at Miami County Mental Health.  (*PageID#* 65).  The ALJ first considered, but ultimately rejected, the opinions of Connie Bottorf, L.C.D.C., and Stacy Fellers, L.P.C.C., as lacking consistency with, or supportability, in the record.  (*PageID#* 66).  The ALJ noted that while Ms. Bottorf, a counselor, is not an "acceptable medical source," her opinion is entitled to consideration under the regulations.  The ALJ nonetheless ultimately decided to reject her opinion, and determined "the preponderance of objective examination findings in the record shows that the claimant experiences no more than mild functional impairments," and that "it also appears that the claimant's

34

mental symptoms were primarily related to family problems." (*PageID#* 66).  The ALJ also noted that Plaintiff's "own statements about her limitations and daily activities are inconsistent with a finding of a 'severe' mental impairment," and her "limited mental health treatment casts some doubt on her allegations about the severity of symptoms she experienced after the amended alleged disability onset date.

The ALJ then proceeded to provide a number of examples of inconsistent statements Plaintiff made regarding her limitations and daily activities.  Based on these facts, the ALJ concluded Plaintiff's medically determinable mental impairments are nonsevere.  As is evident from the ALJ's decision, he thoroughly reviewed the mental health records, in their entirety, and concluded no mental functioning restrictions are warranted in Plaintiff's residual functional capacity. (*PageID#* 67).  Plaintiff certainly may disagree with how the ALJ weighed the evidence, however, the ALJ's Step 2 finding is supported by substantial evidence in the record and should not be disturbed.

**3.**

Plaintiff also argues the ALJ erred in finding that she was not credible. (*PageID#* 696).  Plaintiff argues she had findings associated with disabling pain (which support her allegations), and the ALJ therefore erred in finding she was not credible. (*PageID#* 697). Defendant contends the ALJ's credibility finding was reasonable and supported by substantial evidence in the record. (*PageID#* 715).

A social security applicant's credibility is evaluated in two parts: "First, the ALJ

will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citations omitted). A list of factors — for example, "claimant's daily activities; location, duration, frequency and intensity of symptoms; factors that precipitate and aggravate symptoms...," *id.*, assist the ALJ in evaluating an applicant's symptoms.

The ALJ cited the applicable credibility regulations, and accurately described the legal criteria applicable to evaluating Plaintiff's credibility.  (*PageID#* 69).  In light of this, the ALJ did not err as a matter of law when evaluating Plaintiff's credibility. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007)(describing the applicable legal criteria). The issue, then, is whether substantial evidence supports the ALJ's reasons for not fully crediting Plaintiff's testimony.

"[T]he ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.' Rather, such determinations must find support in the record." *Rogers*, 486 F.3d at 241 (quoting in part Social Security Ruling 96-7p, 1996 SSR LEXIS 4, 1996 WL 374186, at *4). When substantial evidence supports the ALJ's credibility findings, his findings are "accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127

F.3d 525, 531 (6th Cir. 1997).

A review of the ALJ's detailed credibility determination shows he reasonably found that certain factors undermined Plaintiff's credibility.  (*PageID#* 69-73).  The ALJ first noted that Plaintiff's "assertion that she has not been able to work at any time since the alleged disability onset date is not supported by objective medical evidence." (*PageID#* 70).  The ALJ then considered Plaintiff's cervical and lumbar spine imaging, as follows:

> Lumbar spine imaging on July 23, 2007, was normal and showed no evidence of fracture or subluxation (Exhibit 1F, page 12).  As noted in Finding Number 3 above, an MRI of the lumbar spine on August 3, 2007, showed disc desiccation at L2-3, L3-4, and L5-S1, but the report showed only minimal disc bulging and small disc protrusions from L2-3 through L5-6 with no associated spinal canal stenosis or neuroforaminal narrowing (Exhibit 1F, pages 8-9).  An MRI of the cervical spine at that time showed a left paracentral disc protrusion at C3-4 which was pressing on the spinal cord but only mildly narrowed the left neuroforamen.  The report also showed only mild disc bulging from C4-5 through C6-7 with only minimal left neuroforaminal narrowing and no spinal canal stenosis (Exhibit 1F, pages 10-11).  Further, lumbar spine imaging on November 10, 2009, showed only mild progression of the degenerative changes at L2-3 and sclerosis associated with the brawny superior aspect of the L2 vertebral body (Exhibit 20F, page 1), and bilateral sacroiliac joint imaging on November 10, 2009, was normal (Exhibit 21F, page 1).

(*PageID#* 70).  Next in the ALJ's credibility assessment, he considered the objective signs and findings from Plaintiff's treating and examining physicians.  The ALJ noted that pain specialist, Dr. Smith, "stated that a pain examination revealed pain over the cervical and lumbar areas but also showed full strength in the upper extremities, normal reflexes, and normal sensation (Exhibit 7F, pages 2-3)."  (*PageID#* 70).  The ALJ also noted that Dr. Smith indicated the MRI in October 2007 showed a "more pronounced"

disc bulge at L3-4 but it did not impinge the nerve root and that Dr. Reitz stated the

second MRI only showed mild impingement.  (*PageID#* 71).

The ALJ next considered Plaintiff's treatment with chiropractor Dr. Hummel.

(*PageID#* 71).  The ALJ noted that Plaintiff reported to Dr. Hummel on multiple

occasions that her neck and back pain decreased, and that she reported "significant

improvement" with "75% less" achiness and stiffness.  (*Id.*).  The ALJ also stated that

notes from Plaintiff's treating physician, Dr. Reitz, "do not support the claimant's

complaints of disabling pain." (*Id.*).  The ALJ noted that Dr. Reitz reported Plaintiff's

musculoskeletal examination was "normal" and Plaintiff's problems were "stable," on

multiple occasions.  (*PageID#* 71-72).

The ALJ then discussed Plaintiff's level of compliance with treatment

recommendations, and determined she has been noncompliant.  The ALJ first noted that

in July 2007 Plaintiff was discharged from rehabilitation "after attending only one therapy

session and making no further attempts to schedule appointments," and that after being

off medication in March 2009 due to loss of insurance, she did not subsequently restart all

of her medication.  (*Id.*).   The ALJ also determined that even though Plaintiff has

sometimes been noncompliant, "the record shows that the claimant's treatment has been

relatively effective in controlling her pain."  (*Id.*).  In support of this finding, the ALJ

noted that Plaintiff informed Dr. Smith in September 2007 that the TENS unit helped her

symptoms; the Plaintiff also told Dr. Reitz the TENS unit helped to relieve her pain in

October and November 2007; Dr. Reitz stated in a letter in September 2008 that Plaintiff

was experiencing "beneficial results" from the TENS unit; and Dr. Reitz reported

Plaintiff's chiropractic treatment was also helping. (*Id.*).

Finally, the ALJ evaluated Plaintiff's daily activities and reached the following

conclusions:

> The claimant's description of daily activities is inconsistent with her complaints of disabling symptoms and limitations. The claimant told Dr. Boerger on February 29, 2008, that she drove her son to school every day, cared for her four-year-old son during the day, sometimes did light housework and washed dishes, prepared meals for herself; and enjoyed reaching [sic], working on the computer, and going out to eat once per week (Exhibit 8F, pages 5-6). Although the claimant stated at the hearing that she was unable to lift more than five pounds at a time, she told Dr. Hummel on July 3, 2009, that she had been 'moving boxes' and doing 'heavy lifting' (Exhibit 24F, page 3). Further, the claimant stated elsewhere in the record that she was able to prepare simple meals and could do light household chores, and that she sometimes attended church (Exhibits 4E, 5E, 8E, and 10E). The performance of such activities on a regular and continuing basis indicates that the claimant's level of pain and depression does not seriously interfere with her ability to maintain attention and concentration, perform routine tasks, understand and follow simple instructions, and interact with others.
>
> In sum, the above residual functional capacity is adequate to address the location, frequency, duration, and intensity of claimant's bona fide symptoms as well as any reasonably anticipated aggravating and precipitating factors. Her subjective symptoms lack credibility to the extent that they purport to describe a condition of disability for Social Security purposes.

(*PageID##* 72-73).

The ALJ discussed the lumbar spine and cervical spine imaging; the objective

signs and findings from Plaintiff's treating and examining physicians; Plaintiff's level of

compliance with treatment recommendations; and description of daily activities in

relation to complaints of disabling symptoms and limitations. (*PageID#* 69-73). Based

on this evidence, the ALJ determined Plaintiff lacks credibility. This finding is certainly

reasonable and supported by substantial evidence.

Plaintiff also argues that the ALJ essentially misconstrued improvements in her level of pain as a conclusive indication she could perform work activity on a regular and sustained basis. (*PageID#* 698). This argument, however, is without merit. This is not a case where the ALJ simply relied upon isolated instances of improved pain reports, while disregarding other evidence supporting a disability finding, in order to support a nondisability decision. The ALJ, very thoroughly, in fact, considered much more than Plaintiff's improvements in pain. As discussed previously, the ALJ considered, with significant attention to detail, the entirety of the evidence. First, he considered the lumbar spine and cervical spine imaging reports. Next, he considered the objective signs and findings from Plaintiff's treating and examining physicians, followed by Plaintiff's level of compliance with treatment recommendations.

Lastly, the ALJ considered Plaintiff's reports of daily activities. He determined Plaintiff's "description of daily activities is inconsistent with her complaints of disabling symptoms and limitations," and provided numerous supporting examples. (*PageID#* 72). For instance, he noted Plaintiff reported to her chiropractor on July 3, 2009,[3] she had been "moving boxes" and doing "heaving lifting," yet stated she was unable to lift more than

---

[3] Although the ALJ correctly noted Plaintiff reported "moving boxes" and doing "heavy lifting" on July 3, 2009, the record also indicates she made the same report to her chiropractor, Dr. Hummel, on June 29, 2009, and July 10, 2009. (*PageID#* 530). The record also reveals that Dr. Hummel reported on February 8, 2010, Plaintiff's increase in pain on that date was due to her "increased shoveling snow," and on March 8, 2010, reported the increase in pain on that date was due to Plaintiff lifting groceries and her younger (six-year old) son. (*PageID#* 541).

five pounds at the hearing held in May 2010.  (*PageID# 72*).

The ALJ's findings are supported by substantial evidence, and should therefore be affirmed.  *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)) ("'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'  Therefore, if substantial evidence supports the ALJ's decision this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability determination be AFFIRMED; and

2.      The case be terminated on the docket of this Court.


February 21, 2013

                                    s/Sharon L. Ovington
                                    Sharon L. Ovington
                        Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(c), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).